UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MITCHELL MORMILE,

    Plaintiff,

v.

UNITED WHOLESALE MORTGAGE, LLC,

    Defendant.

_____/

Case No. 25-cv-

Hon.

ERIC STEMPIEN (P58703)
MALLORIE M. BLAYLOCK-DANNA (P84331)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P|F: 734-744-7002
E: eric@stempien.com
   mallorie@stempien.com
   mariam@stempien.com (asst.)

## COMPLAINT AND JURY DEMAND

Plaintiff, MITCHELL MORMILE, by and through his attorneys, Stempien Law, PLLC, hereby complains against the Defendant, UNITED WHOLESALE MORTGAGE, LLC, and in support thereof states:

1. Plaintiff MITCHELL MORMILE ("Plaintiff") is a resident of the County of Genesee, State of Michigan.

2. Defendant UNITED WHOLESALE MORTGAGE, LLC ("UWM" or "Defendant") is a Michigan domestic limited liability company that conducts

1

a systematic and continuous business, and with its principal place of business located in, the City of Pontiac, County of Oakland, State of Michigan; its resident agent for service of process being: The Corporation Company, 40600 Ann Arbor Road, E., Suite 201, Plymouth, MI 48170.

3. Jurisdiction is vested with this Court pursuant to 28 USC §1331, et. seq., 42 USC §12101, et. seq., 29 USC §1132(e)(1), and 29 USC §2601, et. seq.

4. On or about January 28, 2025, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights to Plaintiff.

## **GENERAL ALLEGATIONS**

5. Plaintiff was employed with UWM as an Operations Specialist 1, beginning on October 5, 2021.

6. Plaintiff was then promoted by UWM to Operations Specialist 2 and later promoted to Production Analyst.

7. In October 2023, Plaintiff was promoted again by UWM to Associate Business Analyst and continued working as an Associate Business Analyst until his termination on February 6, 2024.

8. In 2020, after honorably serving his county as an Airman in the U.S. Air Force, Plaintiff was discharged under honorable conditions from the United States Military in 2020 as 80% disabled with a head injury.

9. Plaintiff suffers from several serious medical conditions, including post-traumatic stress disorder ("PTSD") and migraines, which have resulted in a disability.

10. Beginning in or about October 2022, Plaintiff applied for, and was granted, intermittent leave pursuant to the Family Medical Leave Act, 29 USC §2601, et. seq. ("FMLA") for migraine flare-ups due to his disability.

11. In or about August 2023, Plaintiff secured a certified service dog for his disability, upon prescription from his physician, through Veteran's Service Dog Organization in Howell, Michigan, which provides service dogs to veterans free-of-charge upon completion of training developed to create a bond and relationship between U.S. Military veterans and their certified service dogs.

12. Plaintiff's certified service dog is a 40-pound female Norwegian elkhound.

13. Plaintiff's certified service dog alerts him to when persons are approaching from behind, for his PTSD.

14. Plaintiff's certified service dog smells Plaintiff's migraines before they occur and alerts Plaintiff to take his prescription preventative medication for his migraines.

15. If Plaintiff does not take his prescription medication until he himself realizes that he is going to have a migraine, the medication is not effective.

16. Medication cannot reasonably or medically substitute Plaintiff's need for his certified service dog's skills and training.

17. Plaintiff sought reasonable accommodations under the Americans with Disabilities Act, and 42 USC §12101, et. seq. (as amended) ("ADA") for his disability to have his certified service dog with him at work.

18. Plaintiff requested UWM provide him with documentation/forms so that he could formally request that UWM permit him to utilize his necessary certified service dog while at work.

19. Plaintiff's new, post-promotion supervisor, Logan, advised Plaintiff that he would discuss the request with UWM's Human Resources ("HR").

20. HR's Heidi Siemon ("Siemon") told Plaintiff that he was not getting a service animal and claimed that UWM cannot accommodate Plaintiff's request for accommodation because of allergies.

21. Siemon's blanket statements that UWM was refusing to accommodate Plaintiff were made prior to Plaintiff even having the opportunity to submit necessary documentation to UWM in support of his reasonable request.

22. Plaintiff attempted to engage in an interactive process with UWM by providing a list of tasks that his certified service dog performs for him, however, UWM went through each task and baselessly claimed there are alternatives.

23. UWM refused to provide Plaintiff with the documentation/forms necessary for Plaintiff to verify that his service animal is, in fact, a certified service animal.

24. UWM denied Plaintiff's reasonable request for accommodation during the same time period UWM promoted him, August 2023.

25. Deana Mathews ("Mathews"), UWM's assistant Vice President, claimed that UWM cannot accommodate Plaintiff's request because the certified service dog would bark.

26. Mathews further claimed that UWM cannot accommodate Plaintiff's request because the certified service dog would would distract others.

27. Mathews told Plaintiff that "over 150 Security Team Members, inside the building roving, at all entrances, outside roaming, and 2 security command centers, watching several different angles throughout the 3 buildings" was sufficient to assuage Plaintiff's PTSD.

28. Mathews told Plaintiff that a "Fitbit" would be sufficient to detect Plaintiff's migraines.

29. Jason Bressler ("Bressler"), UWM's Executive Vice President over Plaintiff's division, told Plaintiff that Mat Ishbia ("Ishbia") UWM's billionaire President and CEO, will *never* allow *animals* in UWM's building.

30. Plaintiff's certified service dog is not a pet. She is necessary, prescribed medical equipment.

31. Interestingly, UWM permits brokers with service dogs to enter UWM's building.

32. UWM could have reasonably accommodated Plaintiff by allowing him to use his certified service dog at work, at his desk in the open-office space.

33. UWM could have reasonably accommodated Plaintiff by allowing him to work in the empty spare office that was right by his desk.

34. UWM could have reasonably accommodated Plaintiff by allowing him to work remotely from home.

35. UWM denied Plaintiff's reasonable request to permit Plaintiff to use the available spare office.

36. UWM denied Plaintiff's reasonable request to work remotely from home.

37. UWM refused to accommodate Plaintiff in any meaningful way.

38. On or about December 19, 2023, after Plaintiff's requests for accommodation were denied, Plaintiff requested that he and UWM discuss his requests further with a mediator "to help navigate through this," so that Plaintiff did not make any "rash decisions," such as quitting out of frustration or prematurely initiating a charge with the EEOC.

39. Mathews took this as an opportunity to wrongly categorize Plaintiff as being a hazard and dangerous to other UWM employees.

40. On January 4, 2024, Mathews advised Plaintiff that, "[UWM] will not get a mediator or a third party to help in this process… Given… comments such as not wanting to make any 'rash decisions,' … the Benefits team will not meet with you in person again unless there is a member of the Security team present."

41. As a result, Plaintiff was forced to take a leave of absence beginning on or about January 4, 2024.

42. Plaintiff sought workers' compensation benefits as a direct result of the stress and anxiety caused by UWM's discrimination and refusal to accommodate.

43. Plaintiff was ultimately placed on short term disability ("STD") for his leave of absence beginning on or about January 4, 2024.

44. Plaintiff's STD was renewed as continuous leave for both PTSD and migraines.

45. Plaintiff's leave of absence beginning on or about January 4, 2024 resulted in wage loss.

46. On January 8, 2024, Plaintiff reported to Michelle Salvatore ("Salvatore"), UWM's Team Member Services ("TMS") Leader, that:

> I am writing to express my deep concerns about the current work environment, which I believe has become

7

>increasingly hostile and impacting my ability to work effectively. Over the past 2-3 months, I have observed and experienced behaviors that have escalated into a hostile atmosphere. I have attempted to address these concerns personally but without resolution. Therefore, I feel it is necessary to formally bring this matter to your attention as I was informed that you handle TMS complaints.
>
>I believe in fostering a positive and collaborative work environment, and I am hopeful that addressing these concerns will contribute to achieving that goal.

47. Also on January 8, 2024, and in response to Salvatore's follow-up questions for details, Plaintiff reported that "there are accusations from TMS that are being thrown around I'm at risk of hurting someone. It has gotten to a point where I do not feel comfortable walking around the buildings knowing that if I pass one of those people that they could freak out on me. It also seems that I'm being discriminated against by TMS in multiple instances and I'm being shot down and degraded as if I have not been trying to work with your team which I have reached out to you previously about."

48. No corrective action was taken in response to Plaintiff's reporting of the hostile work environment, harassment, discrimination, and retaliation.

49. UWM falsely alleged that Plaintiff was going to present to UWM's holiday party in full military tactical gear when, in reality, Plaintiff actually stated that he was considering presenting to the holiday party with his certified service

animal in his miliary attire for formal events, commonly known as "dress blues."

50. Plaintiff remained on a leave of absence until February 6, 2024, when UWM terminated his employment.

51. Plaintiff was, and is, qualified for the positions of Operations Specialist, Production Analyst, and Associate Business Analyst.

52. UWM's actions were pretext for disability discrimination and retaliation.

## COUNT I – VIOLATION OF AMERICANS WITH DISABILITIES ACT (FAILURE TO ACCOMMODATE)

53. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

54. Plaintiff was a qualified individual with a disability, as that term is defined by the ADA.

55. Plaintiff has a disability as that term is defined by the ADA.

56. Defendant was aware of Plaintiff's disability.

57. Plaintiff made a request for a reasonable accommodation as explained herein above.

58. Plaintiff engaged in the interactive process with Defendant regarding the structure, timing and other factors related to his request for reasonable accommodation.

59. Such reasonable accommodations would not be an undue burden on Defendant.

60. Defendant failed and refused to grant any reasonable accommodation to Plaintiff.

61. The actions of Defendant and its agents, representatives, and employees were intentional in their disregard for the rights and sensibilities of Plaintiff.

62. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered damages, including but not limited: loss of job position, lost past and future wages, lost past and future employment benefits, loss of earning capacity, emotional distress and attorney fees.

**COUNT II – VIOLATION OF AMERICANS WITH DISABILITIES ACT
(DISABILITY DISCRIMINATION/RETALIATION)**

63. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

64. Plaintiff is a disabled person within the meaning of the ADA.

65. Defendant regards Plaintiff has having a disability.

66. Plaintiff is qualified for the positions of Operations Specialist, Production Analyst, and Associate Business Analyst, with or without reasonable accommodation.

67. Plaintiff has suffered an adverse employment action, including but not limited to discharge from employment.

68. The adverse employment actions taken by Defendant were made because of Plaintiff's disability.

69. Further, Plaintiff was subjected to the adverse employment action because of an actual or perceived physical or mental impairment.

70. As a direct and proximate result of Defendant's disability discrimination, Plaintiff has suffered damages as fully set forth herein.

## COUNT III – VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (FAILURE TO ACCOMMODATE)

71. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

72. Plaintiff was a qualified individual with a disability, as that term is defined by the Persons with Disabilities Civil Rights Act, MCL 37.1101, et. seq. ("PDCRA").

73. Plaintiff has a disability as that term is defined by the PDCRA.

74. Defendant was aware of Plaintiff's disability.

75. Plaintiff made a request for a reasonable accommodation as explained herein.

76. Plaintiff was denied reasonable accommodation to accommodate his disabilities.

77. Plaintiff engaged in an interactive process with Defendant regarding the structure and other factors related to his requests for reasonable accommodation, as explained herein.

78. Such reasonable accommodations would not be an undue burden on Defendant.

79. Defendant has failed and refused to grant any reasonable accommodations to Plaintiff.

80. The actions of Defendant and its agents, representatives, and employees were intentional in their disregard for the rights and sensibilities of Plaintiff.

81. As a direct and proximate result of Defendant's violation of the PDCRA, Plaintiff has sustained injuries and damages, including but not limited to: loss of job position, loss of career opportunities, lost past and future wages, lost past and future employment benefits, loss of earning capacity, attorney fees, mental and emotional distress, humiliation and embarrassment, and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

**COUNT IV – VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (DISABILITY DISCRIMINATION)**

82. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

83. Plaintiff is a disabled person within the meaning of Michigan's PDCRA.

84. Defendant regards Plaintiff as having a disability.

85. Operations Specialist

86. Plaintiff is qualified for the positions of Operations Specialist, Production Analyst, and Associate Business Analyst, with or without reasonable accommodation.

87. Plaintiff has suffered an adverse employment action, including but not limited to discharge from employment.

88. The adverse employment actions taken by Defendant were made because of Plaintiff's disability.

89. Further, Plaintiff was subjected to the adverse employment action because of an actual or perceived physical or mental impairment.

90. As a direct and proximate result of Defendant's disability discrimination, Plaintiff has suffered damages as fully set forth herein.

WHEREFORE, Plaintiff, MITCHELL MORMILE, prays that this Honorable Court enter a judgment in his favor and against Defendant, UNITED WHOLESALE MORTGAGE, LLC, of an amount deemed reasonable which represents and reflects the following damages:

    a. loss of job position;

    b. loss of career opportunities;

    c. lost past and future wages;

    d. lost past and future employment benefits;

    e. loss of earning capacity;

    f. mental and emotional distress;

    g. humiliation and embarrassment;

    h. loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice;

    i. plus interest, costs and attorney fees as allowed by statute.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.

Respectfully submitted,

STEMPIEN LAW, PLLC

*/s/ Mallorie M. Blaylock-Danna*
MALLORIE M. BLAYLOCK-DANNA (P84331)
Attorney for Plaintiff

Dated: February 25, 2025